**K LAZY K RANCH, INC.; Simon Kusser; and Joe Kusser, Plaintiffs,**

v.

**FARM CREDIT BANK OF OMAHA, successor-in-interest to the Federal Land Bank of Omaha; Richard L. and Bernadette A. Knox; Gerald W. and Doris J. Knox; and Todd Cowan, Defendants.**

**Civ. No. 90–3028.**

United States District Court, D. South Dakota, C.D.

May 15, 1991.

James P. Hurley, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., Jonathan K. Van Patten, Vermillion, S.D., for plaintiffs.

Brent A. Wilbur, May, Adam, Gerdes & Thompson, Pierre, S.D., for defendant Federal Land Bank of Omaha.

William G. Taylor, Woods, Fuller, Shultz & Smith, P.C., Sioux Falls, S.D., for defendants Richard L. and Bernadette A. Knox,

Gerald W. and Doris J. Knox, and Todd Cowan.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

The plaintiffs, K Lazy K Ranch, Inc., Simon Kusser and Joe Kusser, filed an adversary proceeding in bankruptcy court contending that the defendant, Farm Credit Bank of Omaha (FCBO), had breached the terms of a stipulation agreement which had been approved by the bankruptcy court. The adversary proceeding was transmitted to this Court based on the bankruptcy court's finding that the defendants were entitled to a jury trial. The trial was held in March of 1991 with the jury finding in favor of the defendants. During the course of the trial, this Court ruled on several issues as a matter of law. This memorandum opinion explains the Court's rulings in further detail.

### I. FACTS

The plaintiffs are K Lazy K Ranch, Inc., a South Dakota family farm corporation, and Simon and Joe Kusser, stockholders of the corporation. Plaintiffs filed a voluntary Chapter 11 petition in bankruptcy court on January 28, 1987. At the time of the filing plaintiffs owed $942,800.00 principal and $204,324.56 interest to FCBO. The loan was secured by a mortgage on approximately 7,000 acres of plaintiffs' land.

On April 22, 1988, FCBO and plaintiffs entered into a written agreement.[1] By the agreement, plaintiffs deeded the 7,000 acres of land to FCBO and FCBO then leased the land back to plaintiffs for two years. The stipulation agreement provided that plaintiffs "shall be accorded all rights to which they are entitled under the Farm Credit Act of 1987, Public Law 100–233, or otherwise provided by law."[2]

On December 7, 1988, FCBO had an appraisal done on the entire 7,000 acres by

---

1. The agreement was titled "stipulation of settlement" and was approved by the bankruptcy court on May 24, 1988. Exhibit No. 83.

2. In an order filed March 20, 1991, and an amended order filed May 15, 1991, this Court more fully discusses the plaintiffs' causes of action based on the stipulation agreement.

Jerald M. Lewis, an employee of FCBO. The appraisal was then reviewed and countersigned by Fred Bement who was also an employee of FCBO. The appraisal valued the property at $900,000.00.

Pursuant to the right of first refusal found at 12 U.S.C. § 2219a(b)(1), FCBO notified plaintiffs of their right to purchase the property at the appraised price of $900,000.00. Plaintiffs' counteroffer of $400,000.00 was rejected by FCBO.

Another appraisal was completed by FCBO employees in March of 1989. Paul Reisch and Jim Vietor appraised the property in three separate tracts: Tract I— $178,600.00; Tract II—$186,300.00; and Tract III—$531,800.00. The total appraised value was $896,700.00. Plaintiffs were again given the opportunity to purchase the property at the appraised price and were also advised that they could offer to purchase different portions of the property other than the three tracts which were appraised separately by FCBO. Plaintiffs' counteroffer of $525,800.00 was refused.

FCBO then advertised the property and eventually sold Tract II to defendants Richard and Gerald Knox for $205,000.00. The property was sold under contracts for deed which divided the property between the Knox brothers. Tract I was sold to defendant Todd Cowan for $180,000.00. After the sale of Tracts I and II, plaintiffs purchased Tract III, which consisted of approximately 3500 acres, for $450,000.00.

Subsequent to the sales of Tracts I, II, and III, plaintiffs brought an adversary proceeding in bankruptcy court claiming FCBO breached the terms of the stipulation agreement. Plaintiffs asserted five causes of action: 1) failure to comply with statutory requirements;[3] 2) breach of stipulation agreement; 3) breach of the covenant of good faith and fair dealing; 4) injunctive relief; and 5) declaratory relief. The bankruptcy court granted plaintiffs' motion for injunctive relief by enjoining FCBO from selling, transferring, leasing, or disposing of any of the land previously owned by the plaintiffs. The case was transmitted to this Court by the bankruptcy court for jury trial.

Plaintiffs' assertion that FCBO breached the settlement agreement was based on section 3(e) of the agreement which states that the plaintiffs "shall be accorded all rights to which they are entitled under the Farm Credit Act of 1987, Public Law 100– 233, or otherwise provided by law."[4] Plaintiffs contended that FCBO failed to give them certain repurchase rights set out in the Act when it contracted to sell the land to Cowan and the Knoxes.

## II. DISCUSSION

### A. RIGHT OF FIRST REFUSAL

Plaintiffs claimed FCBO violated the right of first refusal provision of the Agricultural Credit Act of 1987, 12 U.S.C. § 2219a.[5] The resolution of most of the issues presented in this case centered on statutory or contractual interpretation, ruled on by this Court as matters of law

---

3. This first cause of action was dismissed by this Court by order filed March 20, 1991, amended order filed May 15, 1991.

4. Although the stipulation agreement referred to the Act as the Farm Credit Act of 1987, the Act is commonly known as the Agricultural Credit Act of 1987.

5. The relevant provisions of § 2219a are as follows:

(b) Application of right of first refusal to sale of property. (1) Election to sell and notification. Within 15 Days after an institution of the System first elects to sell acquired real estate, or any portion of such real estate, the institution shall notify the previous owner by certified mail of the owner's right—(A) to purchase the property at the appraised fair market value of the property, as established by an accredited appraiser; or (B) to offer to purchase the property at a price less than the appraised value....

(5) Rejection of offer of previous owner. (A) Duties of institution. An institution of the System that rejects an offer from the previous owner to purchase the property at a price less than the appraised value may not sell the property to any other person—(i) at a price equal to, or less than, that offered by the previous owner; or (ii) on different terms and conditions than those that were extended to the previous owner, without first affording the previous owner an opportunity to purchase the property at such price or under such terms and conditions.

during the course of the trial.[6] The following issues were decided by the Court: 1) whether FCBO was allowed, under the Act, to divide the property into separate parcels; 2) whether terms and conditions which were offered to the Knoxes and Cowan, but not to the plaintiffs, violated the Act; 3) whether the Knoxes and Cowan purchased the property for less than the appraised value; 4) whether the plaintiffs could attack the validity of the appraisals used by FCBO; 5) whether FCBO breached the implied covenant of good faith and fair dealing. The Court ruled in favor of the defendants on all of these issues.

The only remaining issue [7]—whether the FCBO appraisers were accredited—was a fact issue submitted to the jury.[8] The jury found the appraisers were accredited.

### 1. Division of the Land into Separate Tracts

One of the claimed violations centered on whether FCBO had the right to divide the property into separate parcels after having elected to sell the entire property. This issue involved statutory construction and a determination of congressional intent. As such, it was a question for the court. *Stissi v. Interstate and Ocean Transport Co. of Philadelphia*, 765 F.2d 370, 374 (2d Cir.1985) (interpretation of a statute is a question of law). (citations omitted); *Beattie Through Beattie v. United States*, 635 F.Supp. 481, 488 (D.Ala. 1986), *aff'd*, 831 F.2d 916 (9th Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1469, 99 L.Ed.2d 699 (1988) (A court must "interpret the words of the statute in light of the purposes the legislature sought to serve.") After examining the statute and the legislative history, this Court ruled that FCBO was not prohibited from dividing the property.

FCBO first appraised, and then offered, the entire 7,000 acres of land to the plaintiffs. After rejecting the plaintiffs' counteroffer, FCBO had the property reappraised as three separate tracts and offered these tracts to the plaintiffs. Plaintiffs contended that once FCBO decided to sell the entire property, it was prevented from dividing the property into separate parcels. Plaintiffs' claim is based on the language of the statute that "[w]ithin 15 days after an institution of the System first elects to sell acquired real estate, or any portion of such real estate, the institution shall notify the previous owner...." 12 U.S.C. § 2219a(b)(1).

In support of their theory that FCBO's decision to sell the entire property precluded it from selling the land in tracts, plaintiffs focused on the words "first elects"— FCBO elected to sell the entire property and must therefore sell the property as a whole. Plaintiffs also relied on a recent bankruptcy court opinion in which the court interpreted the statute "to require that property must be sold as one unit in those cases where an institution of the system elects to sell the *entire* property." *In re Jarrett Ranches*, 107 B.R. 969, 974 (Bankr.D.S.D.1989), *vacated on other grounds, Jarrett Ranches, Inc. v. Farm Credit Bank of Omaha*, 128 B.R. 263 (D.S. D.1990) (emphasis original).

This Court found nothing in the plain language of the statute, or, indeed, nothing in the legislative purpose behind the enactment of the statute to support the plaintiffs' contention that if an institution decides to sell the entire property it is then foreclosed from selling the property in separate parcels. In fact, legislative history shows that the Senate Committee "does not favor the sale of large tracts of acquired

---

**6.** Each of the parties submitted briefs outlining their positions on which issues presented legal questions to be decided by the Court. Plaintiffs' Statement of Legal Issues (No. 90–3028); Defendants' Statement of Legal Issues (No. 90–3028).

**7.** The plaintiffs admitted at the close of their evidence that they had not suffered any damages.

**8.** The plaintiffs agreed with the Court that this was a factual issue. The defendants stated the appraisers' qualifications should be submitted to the jury to see if the qualifications conformed with the Court's definition of accredited unless the Court ruled the appraisers were not accredited as a matter of law. Defendants' Statement of Legal Issues at 1 (No. 90–3028).

farmland. The Committee favors sales in smaller tracts so that family farmers will have an opportunity to acquire additional land." Senate Comm. on Agriculture, Nutrition and Forestry, Farm Credit Act Amendments of 1987, S.Rep. No. 100–230, 100th Congress, 1st Sess. at 35 (November 20, 1987).

Moreover, plaintiffs were given an opportunity to purchase the land as one unit. It was only after their counteroffer was rejected that the bank divided the property into three separate parcels and then offered the parcels to the plaintiffs. It should also be noted that the division into three separate parcels resulted in a slight decrease of the total purchase price; this was not a situation where the bank divided the property into smaller tracts in order to increase the asking price for the property. The division did not prevent the plaintiffs from purchasing the entire property; it merely gave them the added option of buying smaller tracts if they did not have the financial ability to purchase the entire property.

### 2. Different Terms and Conditions

▪ After the plaintiffs' counteroffer on the three separate parcels was refused by the bank, the bank sold two of the tracts to Richard and Bernadette Knox, Gerald and Doris Knox and Todd Cowan. The plaintiffs maintained the Knoxes and Cowan were offered different terms and conditions than those offered to the plaintiffs. Under § 2219a(b)(5), once a bank rejects an offer made by a previous owner the bank cannot "sell the property to any other person— ... (ii) on different terms and conditions than those that were extended to the previous owner, without first affording the previous owner an opportunity to purchase the property ... under such terms and conditions."

No factual questions were presented as to what these terms and conditions were as they were clearly set forth in the contracts for deed. When the facts are undisputed,

the application of a statute's terms to the facts is a task for the court. *Stissi*, 765 F.2d at 374 (citations omitted). After examining the terms offered to the Knoxes and Cowan and the purpose to be served by § 2219a(b)(5), the Court concluded that FCBO did not violate the statute.

The plaintiffs claimed the following terms and conditions were offered to Cowan and the Knoxes [9] but were not offered to the plaintiffs.

1. The right to rescind the contract in the event the bank could not deliver possession of the property by May 15, 1990.

2. If Cowan or the Knoxes were unable to obtain possession of the land by May 15, 1990 then they had the option to delay possession until April 1, 1991, with no interest to accrue on the purchase price between April 1, 1990 to April 1, 1991.

3. If possession was delayed until April 1, 1991 then the bank would pay the real estate taxes for that year.

4. FCBO would indemnify Cowan and the Knoxes and pay their attorney's fees in connection with any litigation or liability concerning the acquisition of the property from K Lazy K Ranch, Inc.

The plaintiffs contended that since these terms were not offered to them, FCBO violated § 2219a(b)(5)(A)(ii) of the Act.

▪ The interpretation of a statute begins with the language of the statute itself. *Mills v. United States*, 713 F.2d 1249, 1251 (7th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). Generally, the words of a statute are given their plain and ordinary meaning. *Fitzpatrick v. Internal Revenue Service*, 665 F.2d 327, 329 (11th Cir.1982). However, a "court must look beyond the express language of a statute where a literal interpretation 'would thwart the purpose of the over-all statutory scheme or lead to an absurd result.'" *Brooks v. Donovan*, 699 F.2d 1010, 1011 (9th Cir.1983), quoting *International Telephone & Telegraph Corp. v. General Telephone & Electronics*

---

**9.** Cowan was the defendant who purchased Tract I. The Knoxes purchased Tract II. The terms and conditions were contained in the contracts for deeds to the property entered into by FCBO and the Knoxes and Cowan. [Exhibit Nos. 1, 3, and 5].

*Corp.,* 518 F.2d 913, 917 (9th Cir.1975). Technically, the argument can be made that certain terms and conditions were given to the Knoxes and Cowan which were not offered to the plaintiff. Logically, this argument collapses under the weight of its absurd results.

■ The apparent purpose behind the different terms and conditions provision in the Act is to ensure that previous owners are not offered less favorable terms and conditions than other prospective buyers. The weakness of the plaintiffs' argument is that all of the supposedly different terms and conditions which were given to Knoxes and Cowan related to the fact that the plaintiffs had possession of the property while the Knoxes and Cowan did not. These terms were inserted because of the possibility, which became a reality, that the plaintiffs would institute some type of legal action to retain possession. If this Court would rule that these terms violated the Act, then in effect it would be ruling that FCBO should have offered the plaintiffs the same terms. Of course, there was no reason to give these terms to the plaintiffs because there was no danger possession would be delayed if the plaintiffs were to purchase Tracts I and II. The plaintiffs already had possession (they were leasing the property from FCBO at the time), and would have continued in possession if they had succeeded in purchasing Tracts I and II. As for the indemnification clause, it can hardly be seriously contended that FCBO would be required to indemnify K Lazy K Ranch, Inc. from proceedings which might be instituted by K Lazy K Ranch, Inc. This situation fits neatly into the exception to the rule which allows a court some flexibility in statutory interpretation if the literal interpretation would mandate an absurd result.

The plaintiffs also contended that the Knoxes were allowed to purchase Tract II in two separate parcels and this was not an opportunity which was given to the plaintiffs. The Knox brothers originally bid on the property as an entire tract. Later, the property was divided when they asked FCBO to split the property for estate planning purposes and were issued two separate contracts for deed, with each brother buying approximately half of Tract II.

The problem with the plaintiffs' contention that they were not offered this opportunity is the fact that FCBO informed the plaintiffs by certified letter that if they desired to purchase different tracts than the ones which were appraised separately, the plaintiffs could make a request to that effect. [Exhibit Nos. 59 and 61]. Although FCBO would not be obligated to appraise different tracts, it would consider any such request, just as it considered and granted the Knox brothers request to split Tract II. Neither Joe or Simon Kusser testified that they asked FCBO if they could purchase a different tract of land, nor did they testify they in fact desired to purchase a tract which had not been appraised separately by FCBO.

### 3. Price Paid by Knoxes and Cowan

The plaintiffs contended that, due to the terms contained in the contracts for deed, the Knoxes and Cowan bought the land for less than the appraised value. Based on this contention, the plaintiffs maintained that FCBO was obligated to notify the plaintiffs and afford them another opportunity to purchase the property before selling the property to the Knoxes and Cowan. The resolution of this issue involved the interpretation of terms relating to the price paid by the Knoxes and Cowan; terms which were contained in unambiguous contracts for deed. The interpretation of an unambiguous contract "is for the court to determine, as garnered from the four corners of the document." *Atkins v. Hartford Cas. Ins. Co.,* 801 F.2d 346, 347 (8th Cir.1986), citing *Press Machinery Corp. v. Smith R.P.M. Corp.,* 727 F.2d 781, 784 (8th Cir.1984). The Court found the Knoxes and Cowan did not purchase the property for less than the appraised price.

Under § 2219a(b)(5)(A), a bank "that rejects an offer from the previous owner to purchase the property at a price less than the appraised value may not sell the property to any other person—(i) at a price equal to, or less than, that offered by the

previous owner ... without first affording the previous owner an opportunity to purchase the property at such price...." The plaintiffs asserted that both the Knoxes and Cowan paid less than the *appraised* price for Tract I and Tract II. The statute itself only requires giving the previous owner another opportunity to purchase if the price offered by another person is equal to or less than the price offered by the *previous owner.* However, the plaintiffs claimed the bank contractually bound itself, in letters to the plaintiffs, to give the plaintiffs another chance to purchase the property if the price offered by other parties was less than the appraised price. In the certified letters which were sent to the plaintiffs to inform them of the appraisals, the letters stated that when the bank "receive[s] an acceptable bona fide written offer from a third party equal to or less than the *appraised* value of the property," the plaintiffs would have the opportunity to match the offer. [Exhibit Nos. 59 and 61] (emphasis added).

The plaintiffs argued this was a modification of a contractual obligation which bound the bank to a more demanding standard than the one imposed by statute. However, whether the bank was bound by the letter need not be decided because under the terms of either the letter or the terms of the statute, FCBO was under no obligation to inform the plaintiffs of the offers made by the Knoxes and Cowan.

The appraised price for Tract I was $178,600.00 and Cowan purchased the property for $180,000.00. [Exhibit No. 1, Cowan Contract for Deed]. The appraised price for Tract II was $186,300.00 and the Knoxes bought the property for $205,-000.00. [Exhibit Nos. 3 and 5, Knoxes' Contracts for Deed]. The prices paid for the tracts were well above the bids submitted by the plaintiffs and also exceeded the appraised values.[10]

4. Validity of Appraisals

■ Under § 2219a(b)(1)(A), after the bank decides to sell the property it must "notify the previous owner by certified mail of the owner's right—(A) to purchase the property at the appraised fair market value of the property, as established by an accredited appraiser...." The plaintiffs claimed the appraisals used by FCBO grossly overstated the market value of the property and violated the implied covenant of good faith and fair dealing.

This claim was based partly on the fact that appraisals which were conducted in 1987 were significantly lower than the appraisals which were completed by the bank's appraisers in December of 1988 and March of 1989.[11] Asserting that the higher appraisals demonstrated a lack of good faith on the part of the bank, the plaintiffs sought to introduce the 1987 appraisals into evidence as proof the later appraisals did not represent the fair market value.

As with the first issue which concerned whether FCBO could sell the land in separate parcels, this issue could only be resolved by statutory interpretation and an

---

**10.** The plaintiffs contended the prices listed in the contracts for deed did not reflect the "true" price which was to be paid by the Knoxes and Cowan. This contention was based on an accountant's figures which purported to show that the actual value of the offers made by the Knoxes and Cowan were less than the appraised value. [Deposition of Kevin Stulken at 9–18]. These figures were mainly based on the "time value of money" by which the accountant evaluated the difference in the cost of financing as between the Knoxes and Cowan and the plaintiffs. However, under § 2219a(e), financing is not to be considered a term or condition of a sale. In addition, the bank was under no obligation to provide the plaintiffs with financing. § 2219a(f).

The accountant also claimed certain "credits" were given to the Knoxes and Cowan which would lower the price paid to below the appraised price. An examination of the Knoxes' contracts for deed reveals that both Richard and Gerald Knox received a direct reduction of the purchase price of $5,200.00. This reduction was based on the fact that FCBO would receive this amount of money from the lease on the property. Yet, even after deducting this "credit" from the purchase price, the price paid by the Knoxes still exceeded the appraised value of the property.

**11.** In May of 1987, the plaintiffs' appraiser, Clarence Mortenson, appraised the property at $516,448.00; FCBO's appraiser, John Widoss, valued the property at $653,000.00 in July of 1987.

evaluation of the congressional purposes which led to the enactment of the Act. *Stissi*, 765 F.2d at 374; *Beattie Through Beattie*, 635 F.Supp. at 488. Presented with this legal question, the Court ruled that the 1987 appraisals could not be admitted into evidence and that the plaintiffs could not attack the validity of the appraisals which were conducted in December of 1988 and March of 1989. This Court interpreted the Act as precluding collateral attacks on the validity of the appraisals.[12]

The plaintiffs argued the validity of the appraisals should be open to attack in order to insure the integrity of the appraisal process. A process, the plaintiffs maintained, which was open to abuse given the fact that the appraisers were employees of FCBO.

However, the factor ignored by this argument is the built-in safeguard of the marketplace itself. Fair market value has been defined as " 'the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or to sell.' " *Estate of Juden v. Commissioner of Internal Revenue*, 865 F.2d 960, 963 (8th Cir.1989), quoting *Hamm v. Commissioner of Internal Revenue*, 325 F.2d 934, 937 (8th Cir.1963), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). In the present case, it was not the appraisal which dictated the price paid for the property; the price was dictated by the market and reflected what a willing buyer would pay for the property.

Recognition by Congress of the safeguards imposed by these market forces becomes apparent when restructuring rights are compared with the rights of first refusal under the Act. As FCBO points out, if a borrower's request for restructure of his loan is denied, he has the right to have this decision reviewed. 12 U.S.C. § 2202(b). This appeal includes the right to have the property appraised by an *independent* appraiser. 12 U.S.C. § 2202(d). Congress apparently realized that any appraisal done with respect to whether a loan should be restructured should have the benefit of an independent appraisal because the appraisal would not have the advantage of being subject to the market forces to ensure its validity. In contrast, the provision relating to appraisals conducted in connection with the right of first refusal does not require an independent appraisal. 12 U.S.C. § 2219a(b)(1)(A).[13]

Moreover, the facts in this case would seem to justify Congressional reliance on market forces to ensure that appraisals reflect fair market value. The Knoxes and Cowan all testified that when they bid they were unaware of the appraised price, yet they ultimately purchased the property for above the appraised price. This was clearly a situation where a seller sold to willing buyers who were under no compulsion to buy.[14]

5. Implied Covenant of Good Faith and Fair Dealing

In addition to their breach of contract claims, the plaintiffs argued that FCBO breached the implied covenant of good faith and fair dealing in connection with their contractual obligations. This Court did not submit this claim to the jury because the plaintiffs introduced no evidence that suggested bad faith on the part of the bank. *See E.J. Albrecht Co. v. New Amsterdam Casualty Co.*, 164 F.2d 389, 394 (7th Cir.1947) ("no controversy which called for submission to the jury of the plaintiff's bad faith"); *Moore v. Home Ins. Co.*, 601 F.2d 1072, 1075 (9th Cir.1979) ("insufficient evidence of bad faith to create an issue of fact").

 South Dakota law recognizes the duty to perform a contract in accordance

---

12. The plaintiffs were entitled to have the property appraised by accredited appraisers. This factual issue was submitted to the jury; the jury found the FCBO appraisers were accredited.

13. The use of different terminology within the same piece of legislation is evidence of intentional differentiation. *Lankford v. Law En-*

*forcement Assistance Admin.*, 620 F.2d 35, 36 (4th Cir.1980).

14. The only tract of land which sold for under the appraised value was the tract which was sold to the plaintiffs.

with the implied covenant of good faith and fair dealing. *Garrett v. Bankwest, Inc.,* 459 N.W.2d 833, 841 (S.D.1990). This duty "prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Id.,* citing *Restatement (Second) of Contracts,* § 205 (1981); 3 A. Corbin, *Contracts,* § 541, at 97 (1960); 5 S. Williston, *A Treatise on the Law of Contracts,* § 670, at 159 (3rd Ed.1961). A party must have "limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain." *Id.*

In their trial brief, the plaintiffs claimed that the "appraisals used by FCBO were not obtained in a manner consistent with the implied covenant of good faith and fair dealing." Plaintiffs' Trial Brief at 4 (No. 90–3028). The plaintiffs alleged the appraisals were too high and did not reflect the true market value.[15] In addition, the plaintiffs asserted the appraisals did not establish fair market value because the appraisal reports stated that their only purpose was to determine the value of the land as collateral for a loan. The plaintiffs also pointed out that the appraisers who conducted the first appraisal were not licensed in South Dakota.

As previously noted, the plaintiffs' argument that the appraisals were too high loses considerable force when confronted with the simple fact that the Knoxes and Cowan all purchased the property for above the appraised value. The plaintiffs were unhappy that the new appraisals were higher than the old appraisals but there was no evidence to show that the new appraisals breached the implied covenant of good faith. FCBO was not obligated to rely on the old appraisals, especially when, during the time of the lease, land prices were increasing. Although the appraisers

were employees of FCBO, this is not prohibited by the Act. In addition, the appraisal department of FCBO is a separate and autonomous unit from the lending department. The appraisers testified that they were not told to arrive at any set value in their appraisals. Testimony also revealed the appraisers had extensive experience and training in appraising property. There was no showing that FCBO's use of these appraisers breached the implied covenant of good faith.

Further, the fact that the appraisal reports stated that they were conducted to determine value for purposes of valuing collateral does not mean that the appraisals did not reflect the fair market value. The defendants' expert testified that property appraised for lending purposes would establish the fair market value of the property. Finally, under South Dakota law, the appraisers were not required to be licensed by South Dakota.[16]

### III. CONCLUSION

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. The plaintiffs failed to show FCBO breached the settlement agreement or that FCBO breached the implied covenant of good faith and fair dealing. The plaintiffs were afforded all of the rights to which they were entitled under the Agricultural Credit Act and, thus, the stipulation agreement entered into between FCBO and the plaintiffs was not breached.

---

**15.** The plaintiffs also maintained the Knoxes and Cowan were given special conditions and credits which lowered the amount they paid for the land when compared with the conditions offered to the plaintiffs. These allegations have previously been discussed and dismissed. *See supra* note 7.

**16.** South Dakota law requires real estate brokers and salesmen to be licensed by the real estate commission. SDCL § 36–21–14 (1986). However, financial institutions are exempt from this requirement. SDCL § 36–21–19.1 (1986).